John Burton, State Bar No. 86029
jb@johnburtonlaw.com
THE LAW OFFICES OF JOHN BURTON
414 South Marengo Avenue
Pasadena, California 91101
Telephone: (626) 449-8300
Facsimile: (626) 449-4417

Elbie J. Hickambottom, Jr., State Bar No. 119289
GRONEMEIER & ASSOCIATES, P.C.
1490 Colorado Boulevard
Eagle Rock, California 90041
Telephone: (323) 254-6700
Facsimile: (323) 254-6722

Attorneys for Plaintiffs Georgia Miller, individually, and Denise Bailey as Guardian ad Litem for Philip Arthur Miller, Jr., a minor, and as his authorized representative as the successor in interest to Philip Arthur Miller, deceased

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEORGIA MILLER, individually, and DENISE BAILEY as Guardian ad Litem for PHILIP ARTHUR MILLER, JR., a minor, and as his authorized representative as the successor in interest to PHILIP ARTHUR MILLER, deceased,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF LOS ANGELES and SGT. CESAR MATA,<br><br>Defendants. | Case No. EDCV 07-806 VAP (CTx)<br><br>**PLAINTIFFS' MOTION IN LIMINE NO. 4 TO EXCLUDE OR LIMIT DEFENDANTS' DESIGNATED EXPERT TESTIMONY**<br><br>Pretrial Date: March 23, 2009<br>Time: 2:30 p.m.<br><br>Trial Date: March 31, 2009<br>Time: 8:30 a.m. |

# INTRODUCTION

Defendants made no effort to designate any experts before the first trial. Plaintiffs' designation of police practices expert Roger Clark was deemed untimely by the Court and he was not permitted to testify.

After the jury deadlocked during the first trial, following serious misconduct by defense counsel during the closing argument, the Court granted the parties leave to designate experts. The Court also announced that it would leave its previous rulings on motions in limine in place, at least absent a showing that the orders should be modified.

Plaintiffs again designated Roger Clark, who modified his original Rule 26 Report to incorporate both the Court's in limine rulings and the evidence presented at trial. Defendants designated two expert witnesses, police practices expert Louis Salseda and psychologist William J. Lewinski, Ph.D. For the reasons which follow, plaintiffs now move the Court for an order limiting Mr. Salseda to testimony which does not violate the Court's in limine ruling, and for an order striking altogether the testimony of Dr. Lewinski.

Plaintiffs contend that defendants, who filed no oppositions to plaintiffs' three initial in limine motions, repeatedly violated their letter and spirit during the first trial. To evade the ruling on motion in limine number 2 – precluding references to gangs, gang members and a gang party – defense counsel and their witnesses used code words such as the area being a "rough neighborhood" and characterizing the party-goers as "unsavory characters." In particular, plaintiffs object to defense counsel and Sgt. Mata's repeated use of the epithet "nigger" when purportedly quoting the agitated man who entered the hall shortly before the shooting. The term, in context, was meant to convey that these individuals were African-American gang members.[1]

---

[1] The necessary point can be made by simply describing the man as agitated and irate, as Mr. Salceda does in his expert report, and the two companions as trying to keep him from going back into the party.

- 1 -

1  Defendants flagrantly violate this and another in limine ruling in Mr. Salceda's
2 Rule 26 report. This motion should be granted to prevent them from doing so in front
3 of the jury during the retrial.

4  Dr. Lewinski's proposed testimony cannot meet the gatekeeping standards under
5 *Daubert* and Fed. R. Evid. 26. It should be excluded entirely.

6 **A.  Louis Salceda**

7  Plaintiffs object to the following statements in Mr. Salceda's rule 26 Report, and
8 request that the Court order he not be allowed to so testify at trial:

9  1.  "Upon arrival, at approximately 0020 hours, Sergeant Mata observed
10  several people *wearing gang attire* exiting the double front doors of the Club."
11 Report at 1 (emphasis added). Violates Order on Motion in Limine No. 2.

12  2.  "Sergeant Mata had been assigned to the Southeast Area as a patrol officer
13  from 1991 to 1995 and as a sergeant from August 2006 to January 2007 and was
14  very *familiar with the gangs* in the area of 9714 South Avalon Blvd. Sergeant
15  Mata formulated the opinion that *the gang members* at the Club were *"97 East*
16  *Coast Crips"* due to their baggy blue clothing, cornrow hairstyles, numerous
17  arm tattoos and the location of the Club."
18 Report at 1 (emphasis added). Violates Order on Motion in Limine No. 2. The Court
19 should take notice that Mr. Miller did not have "cornrows" or tattoos.

20  3.  "Sergeant Mata believed due to the presence of *many gang members*
21  *attending the gang party*, that it would be unsafe for only five officers to enter
22  the club."
23 Report at 2 (emphasis added). Violates Order on Motion in Limine No. 2.

24  4.  "According to Sergeant Mata, Miller 'Came out directly right after the
25  suspect (Bean) was shot, so I didn't know if his intention was to finish off, kill,
26  the male who was laying down in front of the location, to look for him, and *he*
27  *was hiding the gun*.'"
28 Report at 5 (emphasis added). Violates Order on Motion in Limine No. 1.

5. "According to Sergeant Mata, Miller was in a drawing position, holding his pant down with his left hand, as *he prepared to pull a gun* concealed in his pants pocket with his right and assume a shooting stance."

Report at 5 (emphasis added). Violates Order on Motion in Limine No. 1.

6. "Based on the totality of the circumstances, including that *there were numerous gang members* at the location . . . ."

Report at 5 (emphasis added). Violates Order on Motion in Limine No. 2.

7. "Sergeant Mata pointed at Miller and told Sergeant Silva, '*He's got a gun* in his right front pocket or somewhere on the sidewalk." Sergeant Silva believed he met with Sergeant Mata behind one of the police vehicles. Sergeant Silva stated that Sergeant Mata stated to him, '*The guy's got a gun*, and I got him, or, I think I got him.'"

Report at 6 (emphasis added). Violates Order on Motion in Limine No. 1. Misstates the evidence.

8. "Sergeant Mata pointed to Levon Bean and stated *the armed suspect (Miller)* chased Bean out of the building. The OIS with Miller occurred at this time. Sergeant Mata told Sergeant Tippet that Miller was still armed with a handgun."

Report at 6 (emphasis added). Violates Order on Motion in Limine No. 1. Misstates evidence.

9. "Sergeant Mata is very knowledgeable regarding *gang members* in Southeast Division. He is familiar with *how gang members dress*, their *gang tattoos*, *how they carry themselves, their mannerisms, how they groom themselves and what community areas of Los Angeles they are active in.* When Sergeant Mata responded to the emergency call generated by Mr. Moore's request for police response to a fight involving approximately 200 people at Mount Nebo Club, 9714 South Avalon Blvd. he correctly formed the opinion that *local gang members* were involved."

- 3 -

Report at 7 (emphases added). Violates Order on Motion in Limine No. 2.

    10.   "Those years working patrol in that area provided knowledge, experience and expertise involving *gang members* that frequent the area."

Report at 8 (emphasis added). Violates Order on Motion in Limine No. 2.

    11.   "Based on his observations Sergeant Mata quickly identified that *'97 East Coast Crips' gang members* were at the Club. . . . *Gang members* do not want police to enter any location where they congregate for fear of arrest for illegal activities. Closing the metal doors placed the officers at an extreme tactical disadvantage had Sergeant Mata elected to enter the Club where approximately 200 people, *gang members among them*, were having a party."

Report at 8 (emphases added). Violates Order on Motion in Limine No. 2.

    12.   "It was reasonable for an experienced officer to surmise that if the party at the Club continued the probability of another incident/fight was very high given the initial 415 fight call, observations of Sergeant Mata, the amount of people and *the gang members* present."

Report at 8. Violates Order on Motion in Limine No. 2 (emphasis added).

    13.   "Sergeant Mata chose to fire his service pistol *before he saw Miller's gun. Allowing Miller to draw his gun* would have put him at a distinct disadvantage. This is because the time it takes for an officer to process visual stimuli (such as seeing a gun) and then react to the threat involves a longer period of time than the suspect's action. Additionally, most people can fire a handgun twice before an officer can react to that action. Simply put, *had Sergeant Mata allowed Miller to draw a handgun* it is entirely possible that Miller could fire one, or even two shots at Sergeant Mata before the sergeant could even respond."

Report at 11. Violates Order on Motion in Limine No. 1 (emphases added).

    Simply put, defense counsel disregarded the Court's in limine orders, and the Court's statement that they will remain in effect for the retrial, when it prepared the defendants' police practices expert for trial. This conduct expresses the same contempt

- 4 -

for the Court's rulings as Mr. Arias' outrageous statement during closing argument that Mr. Miller shot Mr. Bean.

In addition, plaintiffs object to the following gratuitous reference to a bizarre and highly publicized shootout 12 years ago:

> 14. "After the 1997 North Hollywood Bank Robbery, officers are painfully aware of the vulnerability their police vehicles are to penetrating gunfire."

Report at 10. There are no similarities to this incident. The firearms used by the armored perpetrators of the bank robbery were high-powered, fully automatic assault rifles which can penetrate cover that conventional firearms involved in this shooting cannot. All the police witnesses at the first trial acknowledged that LAPD officers are trained to use cover provided by the engine blocks and reinforced doors of their vehicles. Allowing this testimony would confuse the jury and is intended only to appeal to their prejudices and sympathy.

The motion in limine should be granted for each of the foregoing 14 points as to defense expert Louis Salceda, and defense counsel should again be cautioned to avoid violations of the Court's in limine rulings.

**B.     William J. Lewinski, Ph.D.**

Dr. Lewinski's testimony should either be excluded entirely or severely limited to whatever opinions defendants can establish meet the standards of Fed. R. Evid 702, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

Preliminarily, as explained in plaintiffs' ex parte application filed February 27, 2009, defendants have not made Dr. Lewinski reasonably available for his deposition. Defendants demand that plaintiff's counsel travel at his expense to Minnesota, even though next week Dr. Lewinski is going to be traveling from Phoenix to Portland, with a free day in between, and plaintiffs' counsel offered to depose him in Los Angeles on that date for whatever payment the Court orders. Dr. Lewinski is demanding $3,500

minimum for a four-hour deposition ($875 per hour) and another $950 for each additional hour.

These deliberately provocative actions breach defendants' obligation to make their experts reasonably available for deposition, as the Court ordered. In any event, none of Dr. Lewinski's proffered testimony should be admitted.

**1.    Relative shooting time.** As the Court knows, Sgt. Mata testified that he had his firearm in a "Weaver stance" and pointed at Mr. Miller with the safety off. All he had to do was squeeze the trigger of his semi-automatic pistol twice. Dr. Lewinski speculates that this would have taken about three quarters of a second. Report, para. 4. On the other hand, Dr. Lewinski opines it would have taken Mr. Miller only one-quarter of a second to pull a firearm (which incidentally was not there) from his pocket, aim and shoot Sgt. Mata. This is obvious nonsense and cannot pass the *Daubert* test for scientific testimony.

**2.    The Phantom "Turn."** Dr. Lewinski attempts to explain the right side entry wound, despite the fact that Cesar Mata testified at deposition (and again at trial) as follows:

Q.    When you shot him, he was facing more or less northwest?
A.    Yes.
Q.    Sort of directly at you?
A.    Yes.
Q.    And then he sort of with the impact spun around so he was facing southeast?
A.    Yes.

Mata Depo. at 108:2-9. Mr. Salceda, the defendants' police practices expert, described Sgt. Mata's version of the shooting as follows: "Immediately *after the shots were fired*, Miller spun in a counterclockwise direction, to his left, fell to the ground facing slightly southeast with his head facing the building and his back facing Sergeant Mata." Salceda Report at 6 (emphasis added). (There is no way to conclusively determine the

- 6 -

body position because the LAPD move it without taking any photographs over an hour after the shooting.)

Dr. Lewinski's testimony is based on a different version of the facts – one directly contradicted by Sgt. Mata, that Mr. Miller turned *before* the shots were fired – to explain the discrepancy between Sgt. Mata's description of the shooting and his bullet's trajectory, which entered Mr. Miller's neck at a 45-degree downward angle from the right side. That premise directly contradicts Sgt. Mata's justification for the shooting, that he perceived Mr. Miller drawing into a "Weaver" two-handed stance.

Dr. Lewinski writes in his report: "at some point during the shooting [?], Mr. Miller was engaged in turning away from Sgt. Mata and then *after he was shot completed his turn* and fell." Report at 4 (emphasis added). The shooting took a fraction of a second. There is no evidence Mr. Miller began turning before he was shot. (The trajectory suggests, though, that he was facing a different direction and in the process of lying down.) Sgt. Mata's testimony is emphatically to the contrary. Sgt. Mata was clear. He claims he took aim and shot Mr. Miller, aiming squarely in the sternum, because he thought Mr. Miller was drawing into a "Weaver" two-handed stance, which would have put him in a squared up position, not turned. Sgt. Mata said that the impact of the bullet "spun" Mr. Miller around. Thus, Dr. Lewinski's reference to "our studies on 'turning subjects' [in which] the average person in our study completed a simple 180-degree turn in just over half a second while the fastest turn was completed in slightly over a third of a second" is irrelevant and potentially misleading for the jury. The fact that one can turn 180 degrees in less than a second is a matter of common experience, and no expert testimony is necessary. But Sgt. Mata says Mr. Miller was *not* turning, If he were turning, the shooting would not have been justifiable on the basis that Sgt. Mata thought Mr. Miller was drawing into a two-handed stance.

It is for the jury to decide whether "it is entirely consistent with Sgt. Mara's statement that he fired when Mr. Miller was reaching into his right pocket and facing him but by the time Sgt. Mata had completed firing two rapid rounds, Mr. Miller had

- 7 -

1  started to turn away from him and was shot in the side of the neck," not for a hired-gun
2  psychologist. *But see* Report at 4.

3        Dr. Lewinski adds, with a pseudo-scientific gloss, "Our research informs us that
4  subjects who engage law enforcement in a gunfight will often shoot at the officer and
5  turn away from them to run or turn away from them and then shoot at the officer as they
6  are running away from the officer. Therefore when Mr. Miller turned [!], even if Sgt.
7  Mata would have detected the turn, it would still not be a clear indicator that Mr. Miller
8  was no longer a threat." Report at 5. Setting aside the fact that Mr. Miller was not
9  engaged in a gunfight, defendants are clearly attempting to manipulate Fed. R. Evid.
10 702 so they can have it both ways – Sgt. Mata's describing Mr. Miller as squared up
11 facing him and appearing to be drawing into a two-handed shooting stance to justify
12 his shooting, and Dr. Lewinski fabricating a "turn" and a separate justification – a non-
13 existent "gunfight" for the shooting. Such illegitimate tactics violate the Court's in
14 limine order number one and should not be countenanced.

15       **3.**      **The Unsupported Trajectory Opinion.**  Dr. Lewinski continues, "The
16 angle of the bullet path through Mr. Miller's body would also indicate that he was still
17 retaining the right hand position near his pocket and a slightly slouched torso position
18 as he was turning and when he was struck by one of Sgt. Mata's bullet." Report at 5.
19 The Court knows the evidence in this matter, that the sharp downward angle of the
20 bullet is inconsistent with someone being "slightly slouched" and shot from street level.
21 Moreover, the Court heard the testimony of a competent and objective expert – medical
22 examiner Raffi S. Djabourian, M.D. – that there is no way to determine the body
23 position during a shooting simply from the angle of a trajectory in the body. There
24 certainly is no way to determine the right arm's position from this bullet wound, which,
25 as Dr. Lewinski notes, transected the neck at a 45-degree angle and lodged near the left
26 clavicle. And Dr. Lewinski's supposed expertise is in psychology, not ballistics or
27 forensic pathology.
28

Dr. Lewinski proposes to opine that "The 'proning out' allegation is inconsistent with Sgt. Mata's statement; it would also require Mr. Miller to be turning to prone out – *which is a most unusual movement*; or, it would also require him to be in the action of 'proning' and turning at the same time, *which would be most unusual*." Report at 4-5 (emphases added). First, it is for the jury to decide whether Sgt. Mata is telling the truth about Mr. Miller not obeying his and Sgt. Silva's instructions to prone out, not some paid expert. Moreover, elsewhere Dr. Lewinski claims that because of stress Sgt. Mata was "unable to note the precise movement of Mr. Miller during this shooting." Report at 5. Again, defendants seek to use Dr. Lewinski's bogus opinions so they can have it both ways – believe Sgt. Mata when that helps them and disregard him when it does not.

Regardless, there is nothing "unusual" about someone "turning" while proning out on a sidewalk already crowded with dozens of people laying down. That such a movement could be deemed "unusual" is a classic example of a factoid fabricated by someone who thinks he can traipse into a federal court and confuse jurors.

Moreover, plaintiffs do not claim that Mr. Miller was "turning to prone out." Their contention is simply that the trajectory (taking into account Sgt. Mata's position, the damage to the car roof and the blood spot) is only consistent with Mr. Miller facing southwest while proning out, as the officers were directing him and all the many people around him to do. As the Court will recall, defendants offered no alternate explanation for the trajectory at the first trial.

**4.    The Missing Videos.** Finally, Dr. Lewinski concludes his report with the following:

> Mr. Arias, I will need to discuss the videos that I will use, but the videos of our research on subjects firing from an untethered waist band area is up on the Force Science website. I expect to also use some videos illustrating attentional processes and also to personally demonstrate the turning motions of subjects in our first study.

- 9 -

1 Report at 6. No such videos have been identified or produced.They were required to
2 be produced with the expert's report. Fed. R. Civ. P. 26(a)(2)(B)(iii). It is far too late
3 to interject them now into this litigation.

4     There is obviously nothing relating to Dr. Lewinski's proposed testimony to
5 qualify under Fed. R. Evid. 702 as "scientific, technical or other specialized
6 knowledge" that would "assist the trier of fact to understand the evidence or to
7 determine a fact in issue." Accordingly, plaintiffs request that the Court strike his
8 designation as not meeting the tests for scientific testimony stated in *Daubert* and
9 *Kimho Tire*.

## CONCLUSION

11     For the foregoing reasons, plaintiffs' Motion in Limine No. 4 re defendants'
12 experts should be granted in each of its particulars.

13 Respectfully submitted,

14 Dated: March 2, 2009        THE LAW OFFICES OF JOHN BURTON
                                   GRONEMEIER & ASSOCIATES, P.C.

16                                By:    /s/John Burton
17                                   John Burton
                                 Attorneys for Plaintiffs